

FILED

JUN 17 2008

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

)
In re                              )     Case No. 07-30685-A-7
                                   )
INTELLIGENT DIRECT MARKETING,      )
                                   )
        Debtor.                    )
                                   )
_____   )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Findings of Fact

1. Intelligent Direct Marketing (IDM) is a corporation owned and operated by Todd and Raeanne Vowell. IDM is engaged in a commercial enterprise.

2. The Vowells are spouses.

3. An involuntary petition under chapter 7 of the Bankruptcy Code has been filed against IDM. When the petition was filed, IDM had more than 12 creditors.

4. Steadfast, Inc., is a corporation owned and operated by Mr. and Mrs. Vowell.

5. SASHI is a corporation owned and operated by Mr. and Mrs. Vowell.

6. In late 2006 and early 2007, IDM was hemorrhaging financially.

7. The Vowells personally made loans to IDM in 2006 to keep it afloat.

8. By early 2007, IDM was not paying its obligations as they became due. For instance, IDM missed lease payments to its

landlord, Farmers Insurance.  Farmers Insurance eventually
obtained a judgment for possession of the premises as well as a
money judgment against IDM for approximately $244,000.  This
judgment remains unpaid.

9.   Mr. Vowell was conflicted as to how to deal with IDM's
continuing and mounting losses and debt.  He considered shutting
down IDM, both with and without filing a bankruptcy petition.

10.   Early in 2007, Mr. Vowell conferred with IDM's
president, Jeff Garcia, regarding the future of IDM.  Ultimately,
Mr. Vowell decided to shut down IDM as an operating company
without filing a bankruptcy petition.

11.   Mr. Vowell's decision to not file a bankruptcy petition
was an effort to avoid the scrutiny of a bankruptcy trustee.
There is much a trustee would find of interest, including
numerous financial transactions between IDM, the Vowells, SASHI,
and Steadfast, as well as possible preferential and fraudulent
transfers to the Vowells and their other corporations.  These
transfers included the purchase of real property with money
contributed by IDM and the subsequent sale of that property
without repayment of IDM.

12.   Also, the Vowell's personally guaranteed some of IDM's
more significant debts, including a loan made by Bank of America.
Not filing a bankruptcy petition would give the Vowells
considerable leeway to use IDM's available assets to pay
personally guaranteed debt.

13.   The Vowells and IDM did not call as witnesses anyone,
such as an attorney or an outside accountant, to corroborate
their assertions that bankruptcy was seriously considered but was

-2-

1  not pursued for any other more benign reasons.

2      14.   By the end of April, 2007, Mr. Vowell made the decision
3  to shut down IDM's operations without filing a bankruptcy
4  petition.

5      15.   On or about April 27, 2007, IDM terminated its sales
6  staff and ceased business operations.

7      16.   Mr. Vowell then sent, or caused to be sent, letters or
8  e-mails to IDM customers, vendors, landlord, and employees,
9  informing them that IDM had shut down and was out of business,
10  out of money, and could not and would not pay its outstanding
11  bills.

12      17.   Mr. Vowell acknowledged that he prepared these
13  letters/emails but he denied they were actually sent to anyone.

14      18.   The court does not believe Mr. Vowell's testimony.  It
15  was contradicted by the testimony of the petitioning trade
16  creditors.

17      19.   Further, when Mr. Vowell shut down IDM's business
18  operations, there was no plan in place, or even contemplated, to
19  pay creditors other than to pay them nothing or as little as
20  possible (unless the Vowells had guaranteed the debt or payment
21  of a debt might possibly benefit Steadfast's printing business).
22  Hence, sending letters or emails to creditors advising them that
23  IDM had ceased operating and was unable to pay its outstanding
24  debts was entirely consistent with what occurred immediately
25  after April 27, 2007.

26      20.   On May 1, 2007, Mr. Garcia started a new direct mail
27  marketing company, Fidelis.  Mr. Garcia is the owner of Fidelis.
28  He employed many of the former IDM employees.

21.   Fidelis was set up with considerable assistance from
Mr. Vowell.  His company, Steadfast, provided computers, new
software, new customer list, and vendor information to Fidelis.
Mr. Vowell also allowed Fidelis employees to use IDM equipment,
software, and computers.  Mr. Vowell also encouraged the former
IDM employees to join Fidelis and to sell direct mail
advertising.

22.   Mr. Vowell encouraged these former IDM employees to
fulfill IDM's pre-April 27, 2007 contracts and agreements and to
service IDM's former customers.  Mr. Vowell told these employees
to solicit IDM customers, even though these employees, or some of
them, had signed confidentiality and non-competition agreements
with IDM.

23.   Mr. Vowell's efforts to assist in the launch of Fidelis
were not altruistic.  He acted in the hope of personally
benefitting, both directly through a consulting contract with
Fidelis, and indirectly by providing printing services to Fidelis
through Steadfast.

24.   However, Mr. Garcia/Fidelis and Mr. Vowell/Steadfast
never came to terms on a consulting agreement or an agreement for
printing services.  Although Mr. and Mrs. Vowell testified that
the negotiations with Mr. Garcia resulted in an oral agreement
obligating Fidelis to utilize the services of Steadfast as its
exclusive printer and to pay Mr. Vowell a consulting fee, the
court is unpersuaded.  Their discussions were preliminary and
incomplete.  There was no agreement, whether oral or written.
There was never a meeting of the minds.

25.   More to the point in this proceeding, assuming there

-4-

had been an agreement, there is no convincing evidence that IDM's creditors would have benefitted from Mr. Vowell's consulting arrangement or Steadfast's printing revenue.  The court does not believe that Mr. Vowell intended to make any payments to IDM creditors from these revenue sources.  The Vowells were animated by a desire to minimize the payments to IDM creditors while bolstering the business of Steadfast.  This is evident from the fact that a consulting agreement and a Steadfast printing contract would benefit the Vowells but would carry no necessary or demonstrated benefit for IDM or its creditors.

26.  By mid-July 2007, it became evident that Mr. Garcia/Fidelis and Mr. Vowell/Steadfast had reached an impasse and would not agree to terms.  Mr. Garcia/Fidelis found the printing rates being charged by Mr. Vowell/Steadfast to be too high.  As a result, Fidelis discontinued its business with Steadfast.

28.  At this point, Fidelis moved out of Steadfast's Melody Lane building and Mr. Garcia and the Fidelis employees returned all furniture, equipment, cell phones, computers, files, and other property belonging to Steadfast, the Vowells, and IDM.

29.  After Fidelis moved in mid-July 2007, Fidelis acquired its own premises, computers, software, furniture, and supplies.

30.  At trial, the Vowells asserted that IDM's books, records, and files were a shambles because of the nefarious conduct of Mr. Garcia and other Fidelis employees.  For instance, the Vowells asserted that Tony Tran improperly altered or forwarded IDM emails to unauthorized recipients, that Mr. Tran had stolen computer drives and other IDM intellectual property,

1  and that Lawrence Lemus had stolen financial records, as well as

2  embezzled IDM's money and property.  No convincing proof of any

3  of the foregoing was offered to the court.

4      31.  The charges leveled against Messrs Garcia, Tran, and

5  Lemus appear fabricated to justify IDM's failure to pay its bills

6  and to provide some justification for the state court litigation

7  filed by the Vowells/IDM in July 2007 against Mr. Garcia/

8  Fidelis.  While the Vowells testified that the alleged misdeeds

9  of Mr. Garcia and those acting with him have prevented them from

10  ascertaining IDM's legitimate debts, the court believes they have

11  a clear grasp on IDM's financial position and outstanding

12  obligations.

13      32.  The petitioning creditors fall into two categories:

14  trade creditors; and former employees of IDM who hold claims

15  based on unpaid compensation and benefits.

16      33.  The claims of the trade creditors who joined in the

17  involuntary petition hold claims exceeding $90,000.  They are not

18  subject to any bona fide dispute despite assertions to the

19  contrary by the Vowells.  These assertions, which the Vowells

20  also raised in connection with the claims of non-petitioning

21  trade creditors, ring hollow.

22      a.  The Vowells testified that claims of some creditors

23          were not paid because their bills did not agree with IDM's

24          records.  However, no specific discrepancies were

25          demonstrated.  And, even it were assumed that such

26          discrepancies existed, IDM made no specific progress in

27          resolving those discrepancies in the nearly six months from

28          the cessation of business to the filing of the involuntary

-6-

petition.

b.   The Vowells also testified that some bills were not
paid because it was unclear whether the services/goods
provided by the trade creditor was for an IDM contract that
Fidelis or IDM had performed.   The Vowells maintained that
if services or goods billed to IDM were used by Fidelis when
performing a contract for an IDM client, then Fidelis was
required to pay the bill because it was paid by the client.
In fact, the only convincing evidence received by the court
indicated that the Vowells received the payments from IDM
clients even though their contracts were performed by
Fidelis, not IDM.

c.   The Vowells also testified that some bills were not
paid because they were not properly "documented."   However,
this assertion is more a comment on IDM's poor record
keeping than the billing practices of its vendors.

d.   In some instances, the Vowells held up the willingness
of creditors to negotiate a discount of their bills as proof
that their bills must have been in dispute.   However, faced
with a customer like IDM who has halted business operations,
creditors frequently are willing to accept whatever payment
is offered rather than run the risk of nothing.   Their
willingness to settle for less is not convincing evidence of
a bona fide dispute.

e.   As to the $244,000 owed to Farmers Insurance (which is
not a petitioning creditor), the Vowells maintained the
claim was disputed.   This is despite the fact that this
claim has been reduced to a final judgment.   Whether or not

-7-

the Vowells and IDM believe the judgment is erroneous, the fact remains that it is a final judgment.  It is not in bona fide dispute.

f.   Finally, some claims have been paid.  As explained below, although most claims remain unpaid, the few claims that have been paid were paid after the filing of the involuntary petition.

34.   The court regards none of the proffered excuses for not paying the bills of the petitioning trade creditors' claims and the claims of other trade creditors to represent bona fide disputes.  To the extent there might have been some kernel of a legitimate dispute, IDM had more than enough time to investigate and obtain additional information, but it has failed to take reasonable and seasonable efforts to do so.

35.   Beginning in January 2007, IDM began to regularly not pay its bills as they came due.

36.   Exhibit 14 is the most accurate statement of IDM's debt at the end of April, 2007, when business operations ceased.  It is based on IDM's own accounting records.  The assertion that this record was somehow doctored by Mr. Lemus is not supported by any convincing evidence.

37.   At end of April 2007, IDM owed in excess of $900,000 of past due debt.

38.   Mrs. Vowell's assertion that since the end of April 2007, $450,000 of IDM's $900,000 in debt has been paid is untrue.  This supposedly shown by Exhibit A.  Exhibit A, however, is not an accurate statement of amounts paid by IDM.  In part, Exhibit A eliminates approximately $450,000 of debt, not because it was

-8-

1  paid, but because IDM allegedly disputes that it is owed.  As

2  explained above, these alleged disputes are not bona fide

3  disputes.  Exhibit A also lists some debts as being $0, not

4  because they were paid, but because repayment plans had been

5  negotiated.  In most instances, those plan are still executory.

6  In other instances, debts are listed on Exhibit A at $0 because

7  they are owed to IDM's attorneys.  This was done on the

8  assumption that the amount owed to attorneys is somehow

9  privileged information that need not be disclosed.

10      39.  Approximately $875,000 of the debts listed on Exhibit

11 14 remain unpaid and are past due.

12      40.  Nor is IDM's Exhibit HHH an accurate statement of debt

13 paid IDM.  Much of the debt was paid by the Vowells individually

14 or through their other companies.  Payment of IDM's debt by

15 persons other IDM does not demonstrate that IDM is paying its

16 debts as they mature.

17      41.  There are no bona fide disputes for most of the debt

18 listed on Exhibit 14 for the reasons explained in paragraphs 31,

19 33, and 38.

20      42.  In mid-October 2007, the Vowells restarted IDM's

21 business.  While it appears that IDM has been able to keep

22 current with obligations incurred since it restarted its

23 business, the debt outstanding when business was halted in April

24 2007, remains largely unpaid.

25      43.  The claims of the petitioning former employees have two

26 components: claims for compensation and benefits, such as

27 commissions, bonuses, and accrued vacation pay; and statutory

28 penalties for the failure to pay the compensation and benefits.

1  While the statutory penalties are debatable because of the
2  absence of a demand that preceded actions before the California
3  Labor Commissioner for the unpaid compensation and benefits,
4  there is no bona fide dispute as to the claims for compensation
5  and benefits.   IDM's assertions to the contrary are without
6  merit.
7       a.   As noted above, many and perhaps all of the petitioning
8            former employees signed confidentiality and non-compete
9            agreements with IDM.   IDM complains that their work at
10           Fidelis and the solicitation of IDM customers is a breach of
11           those agreements that renders their claims worthless.
12           However, each of the employees was encouraged to work for
13           Fidelis by the Vowells and IDM, and Mr. Garcia and Fidelis
14           were told to solicit IDM's customers and to fulfill its
15           contracts with customers.   To the extent the employees of
16           IDM may have acted in violation of their agreements with
17           IDM, their course of conduct was urged by the Vowells and
18           IDM.
19      b.   The Vowells also maintain that the former IDM employees
20           kept IDM office manuals and other property.   To the extent
21           this may have occurred, it was with the knowledge and
22           consent of the Vowells.   As explained above, Fidelis was
23           organized with the assistance of the Vowells.   They allowed
24           Mr. Garcia and the other former employees to use IDM
25           property to aid in the start-up of Fidelis.   When Mr.
26           Garcia/Fidelis failed to come to terms for a continuing
27           business relationship with the Vowells/Steadfast, Mr. Garcia
28           and the former IDM employees returned all property belonging

to IDM and Steadfast.

c.    The former IDM employees who went to work at Fidelis did not receive all of their IDM compensation.  Mr. Garcia caused Fidelis to loan money to some of these employees. The amount of these loans approximated portions of the compensation due to the employees by IDM.  While the employees signed notes promising to repay these loans, the notes also provided that repayment was not required unless the employees recovered on their claims against IDM.

44.    While it is a close question, the court that finds that the purpose of these loans was not to assign the employee claims to Mr. Garcia so that he could use them to file the involuntary petition.

a.    First, the employees receiving the loans signed the involuntary petition in their own names.

b.    Second, the employees are obligated to repay the loans if they recover on their claims against IDM.

c.    Third, the employees have attempted to enforce their claims in their own names both in this court and before the California Labor Commission.

d.    Finally, the loans were made only to employees with unpaid commission claims.  That is, the loans were made to provide employees with amounts equivalent to unpaid compensation.  Loans were not made on account of unused accrued vacation.  Thus, it appears that Mr. Garcia was acting out of humanitarian concern for his new employees – he was providing them with the compensation they relied upon for living expenses.

-11-

45.    In general, the court found the credibility of Mr. and Mrs. Vowell to be lacking.  Even though it is beyond question that IDM encountered significant financial difficulties that ultimately led IDM to cease business operations, the Vowells maintain the IDM always intended to pay all of its claims.  They maintain that IDM has made substantial progress in the payment of its debt.  However, the only trade creditors to testify supported the petition.  And, the assertion that significant debt has been paid is simply untrue.  Finally, in order to accept the Vowells testimony, one must be prepared to conclude that the former IDM employees are part of some vast and complex conspiracy, and in furtherance of that conspiracy they have purloined property, altered computer files, embezzled money, and filed this petition.  No convincing evidence supports these assertions.

46.    To the extent any of following conclusions of law are findings of fact, they are incorporated as findings of fact.

## Conclusions of Law

1.    IDM is a moneyed, business, or commercial corporation.

2.    IDM has more than 12 creditors.

3.    The petitioners exceed three in number.

4.    The petitioners hold noncontingent claims exceeding $12,300.  While IDM has asserted some disputes concerning these claims, the disputes are not bona fide disputes.

5.    IDM is generally not paying its debts as they become due.  To the extent IDM maintains that it is not paying debts because they are in dispute, the disputes are not bona fide disputes.

6.   The petitioning former employees have not assigned their claims to Mr. Garcia or to Fidelis for the purpose of filing an involuntary petition.

7.   IDM waived any breach of confidentiality agreements and/or non-competition agreements between itself and the petitioning former employees.

8.   To the extent any of foregoing findings of fact are conclusions of law, they are incorporated as conclusions of law.

An order for relief shall be entered by the clerk.

Dated: ~~May 16, 2008~~
June 17, 2008

By the Court

_____
Michael S. McManus, Chief Judge
United States Bankruptcy Court

-13-